**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH    :        **Magistrate No.**
OF THE PREMISES KNOWN AS XXX  :
XXXXXXXXXXXXXX, WASHINGTON,:
DC 20001                      :

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Christopher Janczewski, of the Internal Revenue Service (IRS), being duly sworn under oath, do hereby depose and state:

1.      I am a Special Agent of the IRS, Criminal Investigation ("IRS-CI") and have been so employed since September 2009.  As a special agent, my responsibilities include the investigation of criminal violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (Title 31, United States Code), and related offenses.  Prior to my employment as a special agent, I was a revenue agent in the Examination division of the IRS for three years.  My education includes a Bachelor's Degree in Accounting from Central Michigan University in Mt. Pleasant, Michigan.  As a special agent, I attended approximately 26 weeks of special agent training at the Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia, in various aspects of criminal investigations dealing specifically with criminal law, criminal tax law, money laundering, wire fraud, seizure, and various financial investigative techniques.  I have training and experience in the enforcement of the laws of the United States, including the preparation, presentation, and service of arrest and search warrants.  I am currently assigned to the Cyber Crimes Unit of IRS-CI, have received training in criminal schemes perpetrated via the internet and I hold a Global Information Assurance Certification of Information Security Fundamentals.

I have also consulted extensively with agents and subject-matter experts who have experience investigating child-pornography cases.

2.    Your affiant respectfully submits this affidavit in support of an application for a warrant to search the entire premises known as XXX XXXXXXXXXXXXX, Washington, DC (hereinafter "PREMISES"), a high-rise apartment building, tan in color, with the numbers "XXX" on the outside.   For the reasons set forth in the affidavit, there is probable cause to believe that instrumentalities, fruits, and evidence of violations of Title 18, United States Code, Section 2252(a)(2) Receipt of Child Pornography and Section 2252(a)(4)(B) Possession of Child Pornography, are located within these premises.   I am requesting authority to search the entire premises, including the residential dwelling, the contents therein, and any computer, computer media, and other electronic digital devices located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

## FACTS AND CIRCUMSTANCES

3.    The statements in this affidavit are based in part on my investigation of this matter, information conveyed to me by other law enforcement officers, and the expertise of other law-enforcement officers also familiar with child pornography and child-sexual exploitation investigations and cases.    I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(2) and (a)(4)(B) are presently located at XXX XXXXXXXXXXXXXX, Washington, DC 20001 ("Target Address"), which is the residence of DOUGLAS GLANCY ("GLANCY").

2

## RELEVANT DEFINITIONS

4.      The following definitions apply to this Affidavit and Attachment B:

a.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.   Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.   This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

c.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly

related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices.   See 18 U.S.C. § 1030(e)(1).

      e.     "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.   Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

      f.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.   Data security devices may consist of hardware, software, or other programming code.   A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards.   Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g.      "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.   IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.   IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

h.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.   ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

i.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

j.      "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

k.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

l.      "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

m.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

n.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

o.      Whois: A "Whois" search provides publicly available information as to which entity is responsible for a particular IP address or domain name. A Whois record for a particular IP address or domain name will list a range of IP addresses that that IP address falls within and the entity responsible for that IP address range and domain name. For example, a Whois record for the domain name XYZ.COM might list an IP address range of 12.345.67.0– 12.345.67.99 and list Company ABC as the responsible entity. In this example, Company ABC would be responsible for the domain name XYZ.COM and IP addresses 12.345.67.0– 12.345.67.99.

6

**BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY**

5.      Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

6.      Child pornographers can transfer photographs from a camera onto a computer-readable format with a scanner.   With digital cameras, the images can be transferred directly onto a computer.   A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.   Electronic contact can be made to literally millions of computers around the world.

7.      The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.   The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.   These drives can store thousands of images at very high resolution.

8.      The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

9.      Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Google, among others.   The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.   A user can set up an online storage account from any computer with access to the Internet.   Evidence of such online storage of child pornography is often found on the user's computer.   Even in cases where online storage is used, however, evidence of child

pornography can be found on the user's computer in most cases.

10.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.   Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.   Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).   In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.   A forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded.   Such information is often maintained indefinitely until overwritten by other data.

## BACKGROUND ON TOR, BITCOIN, AND DARKNET MARKETS

11.     **TOR:** The darknet is an un-indexed portion of the web specifically designed to facilitate anonymous communication over the internet.   To reach the darknet, a user must have access to a web browser called The Onion Router ("Tor").   To access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle," which is available at www.torproject.org.[1]   Designed specifically to facilitate anonymous communication over the Internet, Tor effectively bounces a

---

[1]     Users may also access Tor through so-called "gateways" on the open Internet; however, use of those gateways does not provide users with the anonymizing benefits of the Tor network.   Additional information outlining Tor and how it works is publicly accessible at www.torproject.org.

user's communications around a distributed network of relay computers all over the world, making conventional methods of identifying users obsolete.[2]   Additionally, entire websites on Tor can be set up as "hidden services," which operate as ordinary public websites do, with one critical exception -- the IP address (and thus, the location) of the web server is hidden and replaced with a Tor-based, web address.   This address is comprised of a series of algorithm-generated characters, such as "asdlk8fs9dflku7f" followed by the suffix ".onion."   A user can only reach these "hidden services" if the user is using the Tor client and operating in the Tor network. And unlike an open Internet website, is not possible to determine through public lookups the IP address of a computer hosting a Tor "hidden service."   Neither law enforcement nor users can therefore determine the location of the computer that hosts the website through those public lookups.   Though this anonymizing process slows down internet traffic for the user, users generally sacrifice speed for anonymity when engaging in illicit conduct on the Tor network.

12.   **BITCOIN:**  Bitcoin ("BTC") is a type of virtual currency, circulated over the internet as a form of value.[3]   BTC are not issued by any government, bank, or company, but rather are controlled through computer software operating via a decentralized, peer-to-peer network. BTC is just one of many varieties of virtual currency.

13.   BTC are sent to and received from BTC "addresses."   A BTC address is somewhat

---

[2]   When a user on Tor accesses a website, the signal bounces around until it exits the network of computers via an "exit node."   The internet-protocol ("IP") address of the exit node (as opposed to the user's actual IP address) appears on the website's IP log.   Currently, there is no practical method to trace a user's actual IP address back through that Tor exit-node IP address.   Tor makes it extremely difficult for law enforcement to identify and locate a website-host's administrators or users' actual IP addresses and/or physical locations.

[3]  Since Bitcoin is both a currency and a protocol, capitalization differs.   Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each BTC address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password or pin needed to access the address. Only the holder of an address' private key can authorize any transfers of BTC from that address to other BTC addresses. Users can operate multiple BTC addresses at any given time, with the possibility of using a unique BTC address for each and every transaction.

14. To transfer BTC to another address, the sender transmits a transaction announcement, cryptographically signed with the sender's private key, across the peer-to-peer BTC network. The BTC address of the receiving party and the sender's private key are the only pieces of information needed to complete the transaction. These two keys by themselves rarely reflect any identifying information. As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in a BTC transaction itself. Once the sender's transaction announcement is verified, the transaction is added to the blockchain, a decentralized public ledger that records all BTC transactions. The blockchain logs every BTC address that has ever received a BTC and maintains records of every transaction for each BTC address.

15. While the identity of the BTC address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often identify the owner of a BTC address. The analysis can also reveal additional addresses controlled by the same individual or entity. For example, a user or business may create many BTC addresses to receive payments from different customers. When the business wants to move the BTC that it has received, it may group those addresses together to send a single transaction. Analysis of the blockchain information associated with such a transaction would indicate that each of those

addresses was, in fact, part of a "cluster" of BTC addresses controlled by a single entity.   This analysis allows law enforcement and the private sector alike to gain insight into all of the addresses associated with a company.   Several companies specializing in blockchain analysis create large databases for building these clusters and offer software products to facilitate this sort of analysis.

16.     To acquire BTC, a typical user will purchase them from a BTC exchanger.    A virtual currency exchange is a business that allows customers to trade virtual currencies for other forms of value, such as conventional fiat money (*e.g.,* U.S. dollar, Russian ruble, €).   Exchanges can be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies).   Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information of their customers and verify their clients' identities.

17.     Since the blockchain serves as a searchable public ledger of every BTC transaction, investigators may trace transactions to BTC exchangers.   Since those exchangers collect identifying information about their customers, subpoenas or other appropriate process submitted to these exchangers can reveal the true identity of the individual responsible for the transaction.

18.     **DARKNET:**   Darknet markets are commercial websites located within Tor's hidden services that primarily function as black markets, selling or brokering transactions involving drugs, unlicensed pharmaceuticals, cyber-arms, weapons, counterfeit currency, stolen credit-card details, forged documents, illegal pornography, and other illicit goods.   BTC, the most common method of payment for products or services within darknet markets, is generally exchanged on a darknet market as follows:

11

     a.   Centralized method - all transactions pass through the darknet market's BTC addresses; the darknet market takes a commission; and, the vendor receives their payment from the darknet market.

     b.   Decentralized method - transactions take place directly between buyer and seller.[4]

19.      Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment.   This is almost always true because of the following:

     a.   Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information.   Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names.   This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.   This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally difficult to accomplish this kind of data search on site; and

---

[4]     Ebay is an example of a centralized market while Craigslist is an example of a decentralized market.

b.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.   The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.   The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.   Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

20.     In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU).   In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues.   In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

21.     In addition, there is probable cause to believe that the computer and its storage devices are all instrumentalities of the crime(s), within the meaning of Title 18 U.S.C. §§ 2252 and should all be seized as such.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

22.    I know based on my training, experience, and consultation with agents and subject-matter experts who have experience investigating child-pornography cases that most individuals who are sexually attracted to children facilitate their sexual arousal through imagery that focuses, in part or in whole, on children.   Specifically, these individuals often collect child pornography.   These individuals may derive sexual gratification from actual physical contact with children as well as from fantasy involving the use of pictures or other visual depictions of children or from literature describing sexual contact with children.   The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collectors most cherished sexual fantasies involving children.   Visual depictions may range from fully clothed depictions of children engaged in non-sexual activity to nude or partially nude depictions of children engaged in sexually explicit conduct.

23.    In addition to child pornography, these individuals are also highly likely to collect other paraphernalia related to their sexual interest in children.   This other material is sometimes referred to as "child erotica" which is defined as any material, relating to children, that serves a sexual purpose for a given individual.   It is broader and more encompassing than child pornography, but at the same time the possession of such corroborative material, depending on the context in which it is found,   may be behaviorally consistent with the offender's orientation toward children and indicative of his intent.   It includes things such as fantasy writings, letters, diaries, drawings, cartoons and non-sexually explicit visual images of children.

24.    Child pornography collectors reinforce their fantasies, often by taking progressive, overt steps aimed at turning the fantasy into reality in some or all of the following

14

ways:   collecting and organizing their child related material; masturbating while viewing the child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other like minded adults through membership in organizations catering to their sexual preference for children thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement.   These are need-driven behaviors to which the offender is willing to devote considerable time, money, and energy in spite of risks and contrary to self interest.

25.    Persons with a sexual interest in children often maintain and possess their material in the privacy and security of their homes or some other secure location, such as a private office or work computer, where it is readily available.   The collection may include sexually explicit or suggestive materials involving children, such as photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images or other visual media.   Because they put so much time and energy into obtaining the material, they do not delete or destroy their collections.

26.    Recent studies have shown that those who collect child pornography are more likely to be "contact offenders" with children. In a study published in the Journal of Abnormal Psychology, Vol. 15, No. 3, pp.   610-615, by Seto, Cantor, and Blanchard, titled "Child Pornography Offenses Are a Valid Diagnostic Indicator of Pedophilia," the authors concluded an interest in child pornography is a strong indicator of pedophilia. In December, 2010, Seto,

Hanson, & Babchishin, published an article entitled "Contact Sexual Offending by Men With Online Sexual Offenses," in Sexual Abuse: A Journal of Research and Treatment. This article was a meta-analysis of a number of studies of possessors of child pornography. This was a meta-analysis of 24 studies of possessors of child pornography. In the studies that relied only upon subsequent arrests and/or convictions, the number of contact offenses with children ran from 4.6% to 13.3%. In the three studies in which the subjects were subject to polygraph examinations, the percentages ranged from 32.3% to 84.5%, with the middle study finding 55.3%. In the remaining three studies which relied only upon self-reporting, the numbers ranged from 32.8% to 57.4%. Each of the last three studies was unique. In Neutze, Seto, Schaefer, Mundt, & Beier (in press at this time), the subjects were in Germany. They had sought counseling on their own and were not referred by the criminal justice system. In the venue where the study was conducted, therapists were not legally required to report the admissions of their subjects (36.5%). In Quayle & Taylor (2003), the number of subjects was sample small (23) and had established good rapport with the therapists (47.8%). Finally, in Coward, Gabriel, Schuler, and Prentky (2009), the subjects reported anonymously (32.8%). In performing their statistical analysis of these studies, Seto, Hanson, & Babchishin concluded that more than 50% of those convicted of "possession only" admitted to at least one contact offense, when one relied on more than an arrest or conviction for a new offense.

27.     Based on the information set forth in this affidavit, I submit that there is probable cause to believe the target is a collector of child pornography.

## SEARCH METHODOLOGY TO BE EMPLOYED

28.     To search for electronic data contained in computer hardware, computer software, and/or memory storage devices, the examiners will make every effort to use computer forensic software to have a computer search the digital storage media. This may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.      Searching for image files to locate images of children engaging in sexually explicit conduct, examining log files associated with the receipt, transmission, and viewing of such images, and examining all of the data contained in such computer hardware, computer software, and /or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.      Surveying various file directories and the individual files they contain;

c.      Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

d.      Opening files in order to determine their contents;

e.      Scanning storage areas;

f.      Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

g.      Performing any other data analysis technique that may be necessary to

17

locate and retrieve the evidence described in Attachment B.

## THE INVESTIGATION

### A. The Website Background

29.     "The Website" is an online child-pornography website located on the darknet with a Tor-based web address known to law enforcement.   The Website is used to host and distribute child pornography.[5]

30.     Any user has the ability to create a free profile by providing a username and password.   Once the user has an account, the user can browse previews of videos that are available for download and can post to a website chat.   In order to download videos from the site, however, the user must use "points," which are allocated to users by The Website.   A user can earn points by uploading videos depicting the sexual exploitation of children; referring new users; or paying for a "VIP" account, which lasts for approximately six months and is priced at 0.03 BTC (approximately $97.77 USD as of October 17, 2017).   The Website assigns each user a unique BTC address where the user can send funds for purchasing account privileges.   The user can only redeem the points by downloading videos from The Website; the points are not transferable to any other website or application.   Once a user sends BTC to The Website, the BTC cannot be refunded or redirected; the BTC can only be redeemed by downloading videos. The site is similar to a centralized market save one exception – all of the BTC is taken by the administrator.

---

5       The actual name of "The Website" is known to law enforcement.   The Website remains active and disclosure of the name of The Website would potentially alert its users to the fact that law enforcement action is being taken against users of The Website, thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence.   Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified herein as "The Website."

31.     Each video available for download has a title, a description (if added by the uploader), tags with further descriptions for locating with The Website's search function, and a preview thumbnail image containing approximately 16 still images from the video.   Of particular note is the fact that the upload page on The Website clearly mandates: "Do not upload adult porn."   The Website has over 115,000 unique videos available for downloading.   In order to prevent duplicate videos from being uploaded, The Website hashes the new video, compares the hash to hashes of previously uploaded videos, and only allows new videos to be uploaded. The videos stored on The Website account for nearly seven terabytes of data that has been downloaded by users over 1,030,000 times.   As a point of comparison, seven terabytes of data would fill roughly 10,486 CD-ROM discs.

32.     Examples of video files on The Website include a top downloaded video entitled "japan rape.avi" that is approximately ten minutes long.   This video was uploaded to the site by user "123412" with the description of "Admin Upload."   Your affiant believes that based on the description of "Admin Upload," this video was uploaded to the site by the site's administrator. Your affiant reviewed the preview stills of the video.   The video depicts a prepubescent Asian girl approximately ten years old.   The child is naked with her hands duct taped to her ankles on either side.   A naked adult male vaginally penetrates the child's vagina and inserts multiple object into the child's vagina at the same time.

33.     Another top downloaded video is entitled "VID-20140907-WA-001.wmv" and is approximately eight and a half minutes long.   This video was uploaded to the site by user "umamed" with the description of "8yo anal fucked pussy."   Your affiant reviewed the preview stills of the video.   The video depicts a prepubescent girl between the ages of six and eight years

old.   The child's underwear is pulled down around her thighs and she is wearing a blue t-shirt. The child is positioned on all fours while a naked adult male penetrates the child's vagina with his penis from behind.   The adult male repositions the child and then moves the child in several different positions while continuing to penetrate her vagina with his penis.

34.     Other examples of videos from The Website include depictions of toddlers and infants engaged in sexually explicit conduct.   For example, your affiant reviewed the still images of a video entitled "rape toddler girl.mpg," which is approximately one minute and twenty-three seconds long.   The video was uploaded to the site by user "anonymous," who is one of the top uploaders to the site.   The video depicts a toddler girl between the ages of two and three years old.   The video shows the child being anally penetrated by an adult male while she cries into her hands.   The video zooms in to focus on the toddler's vaginal area as the adult male penis penetrates the toddler's anus.

35.     Your affiant also reviewed the still images of a video entitled "americanDad.mkv," which is approximately thirty-three minutes and forty-four seconds long. This video was uploaded to the site by user "nyugiss1," who has uploaded over seventy videos to the site.   The video depicts a baby approximately six months old who is holding an adult penis. In another still frame, the adult male is holding his penis and inserting his penis into the baby's mouth.   In the last still frames, the adult male is forcing his penis into the baby's anus.   These are examples of the types of videos The Website traffics in.

36.     On the video search page of The Website, there is a list of keyword search terms and the number of videos associated with the keyword.   Some of the top keyword search terms and the associated approximate videos are as follows:

| **Keyword** | **Videos** |
|---|---|

| PTHC (short for preteen hardcore) | 10,967 |
|---|---|
| PEDO (short for pedophile) | 7,407 |
| 2yo% | 4,541 |
| %4yo | 4,205 |
| Rape | 3,671 |
| Incest | 3,215 |

### B. Investigation

37.     IRS-CI analyzed BTC addresses associated with The Website and identified nearly 3,000 unique BTC addresses believed to be controlled by The Website ("The Website cluster").   From approximately October 2015 to present, The Website cluster has received over 1,500 payments totaling approximately 268 BTC worth $221,563.   Of these payments, over 1,300 were sent to The Website directly from addresses associated with virtual currency exchanges.   Two hundred of these payments were sent from accounts held at U.S. Exchange 1 in the United States.   A subpoena to this exchange yielded records for these accounts, including customer names as well as additional identifiable information.   Most of the individuals reside in the United States.   Approximately 22 exchange accounts had BTC sent to The Website with a note connected to the transaction listing what appears to be a username on The Website or other information further connecting the transaction to The Website (*e.g.*, "[The Website] VIP" and "for User: karoass (230 downloads)").   Investigators then sent subpoenas to US BTC-wallet providers ("Exchanges") for records to include Know Your Customer documents and transactional history.   These Exchanges are legally obligated to maintain these records.

38.     Authorities subpoenaed U.S. Exchange 1 for these records for any wallets that sent BTC to the Website.   Subpoena returns from US Exchange 1 revealed GLANCY created one of these BTC wallets that authorities determined had sent BTC to the Website.   GLANCY's account was created on or about March 10, 2014.   GLANCY provided his first and last name, SSN, phone number, DOB, and a current address of XXX XXXXXXXXXXXXXX, Washington, DC 20001.   This information has been corroborated by other sources. GLANCY also linked his US Exchange 1 account to a checking account ending in -9070 at United States Senate Federal Credit Union ("USS-FCU") and two credit cards in his name.   GLANCY's US Exchange 1 account purchased approximately 9.66432101 BTC, which is valued at approximately $4,559.63 at the times of purchase.

39.     GLANCY's US Exchange 1 account conducted approximately four transactions of sending BTC to The Website.   The first transaction occurred on or about October 11, 2015 for approximately 0.34 BTC valued at approximately $83.87.   The Website asks for 0.01, 0.02, or 0.03 BTC as payment to increase the users' downloads.   The subsequent three transactions occurred approximately as follows:

| Date | BTC | USD |
|------|-----|-----|
| 10/30/2015 | 0.13 | $42.89 |
| 03/26/2016 | 0.1 | $41.65 |
| 04/30/2016 | 0.09 | $40.76 |

40.     Based on law-enforcement analysis of the marketplaces that received BTC from this wallet, authorities determined that GLANCY had sent BTC directly and indirectly from his US Exchange 1 account to darknet markets known for primarily selling illegal drugs, including seven transactions totaling approximately 2.61684 BTC (approximately $800.87) to Agora

Market and three transactions totaling approximately 0.614686 BTC (approximately $624.27) to Dream Market.   The most recent transactions were two sends to Dream Market on March 1, 2017.

41.     Subpoena returns from U.S. Exchange 1 further showed that on or about March, 26, 2016 GLANCY's US Exchange 1 account sent approximately 0.15 BTC (approximately $62.55) to BM-2cWuGyQQUgTUYWNcJiVUn82Lip2Qxoy2cf@bitmessage.ch.   This BTC address was discussed in a forum where users corresponded about child-exploitation and pornography websites.   The discussions within the forum noted that this BTC address was known to be used by Website 2, another darknet website.   The discussions additionally provided the darknet address for Website 2.   As of September 11, 2017, Website 2 was still operating. The home page describes the site as offering "real blackmail, real rape, real forced and a lot more rare videos of girls."   Users can either contribute new material to the site's administrator, preferably material that they personally produced or provide BTC in exchange for access to over 1,700 videos.

42.     Additionally, subpoena returns from PayPal revealed an account that was registered with GLANCY's email address of dglancy@umich.edu and connected to GLANCY's checking account ending in -9070 at USS-FCU was used to purchase high-end photography equipment, image-editing software, and an online image-hosting subscription.   Based on my training and experience, I am aware that such equipment is often used in the production of child pornography.

43.     Subpoena returns further showed that GLANCY sent BTC to a merchant

associated with the name "Daofile" and the email address of daofile.com@gmail.com.

Depfile.com and Daofile.com are file hosting and files sharing providers.   Law enforcement

discovered a forum post listing depfile.com and daofile.com as sites used to host and share child

pornography.   Both sites are known to law enforcement as being used to host child pornography

in previous investigations.   Based on my training and experience, I know that persons in receipt

of child pornography often store them in online, file lockers, which allow them to view and store

those files on their personal devices.

     44.     On or about Monday, October 23, 2017, law enforcement conducted a border

inspection of GLANCY as he traveled inbound to the United States from the Philippines, which

based on my training and experience, is a known destination for child-exploitation and child,

sexual trafficking.   As part of the border inspection, law enforcement imaged a laptop, his

personal cellphone, and other electronic devices.   Subsequent to the imaging of these items, law

enforcement contacted GLANCY to obtain passwords so that they could access the electronic

devices.   GLANCY returned the phone call from a phone number that was associated with the

U.S. Exchange 1 account that was used to send BTC to the Website.   As such, law enforcement

has reason to believe that GLANCY had in his possession an alternate cellphone that was used to

further his illegal activity.   Based on my training and experience, I know that individuals often

maintain separate personal devices that they use to facilitate their illicit activity.   Based on the

fact that GLANCY made a phone call to authorities using that alternate phone (which he did not

take with him in his travels), authorities have reason to believe that the phone is still within the

Target Address.   On or about October 25, 2017, at approximately 5:00 a.m., GLANCY is

believed to have emailed his sister from the Target Address.   In the email, GLANCY stated that

law enforcement had taken possession of his electronic devices and because of that, he was going

to commit suicide.   Soon thereafter, GLANCY jumped from the balcony of the Target Address, which was his residence, to his death.

## **CONCLUSION**

45.      Based on the foregoing, I, Special Agent Christopher Janczewski, respectfully submit that there is probable cause to believe that there is currently located within the premises known as XXX XXXXXXXXXXXXXX, Washington, DC evidence and instrumentalities of the offense of Possession of Child Pornography in violation of 18 U.S.C. § 2252.   I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the listed items.

_____

SPECIAL AGENT CHRISTOPHER JANCZEWSKI
INTERNAL REVENUE SERVICE


Sworn to and subscribed before me on this   __25th__   day of October, 2017.



_____

Deborah Robinson
United States Magistrate Judge